**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

TAMIKA R. MONTGOMERY-REEVES
VICE CHANCELLOR

LEONARD WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

Date Submitted:  October 11, 2018
Date Decided:  January 10, 2019

David Primack, Esquire
McElroy, Deutsch, Mulvaney &
    Carpenter, LLP
300 Delaware Avenue, Suite 770
Wilmington, DE 19801

John P. DiTomo, Esquire
Alexandra Cumings, Esquire
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street, 16th Floor
Wilmington, DE 19801

RE:   *Merrit Quarum v. Mitchell International, Inc.*
      Civil Action No. 2018-0047-TMR

Dear Counsel:

This letter opinion resolves Defendant's motion to dismiss.  Defendant moves to dismiss for lack of subject matter jurisdiction because, in its view, the complaint fails to sufficiently allege irreparable harm and damages provide an adequate remedy at law. Defendant also moves to dismiss for failure to state a claim.  Because the complaint, when viewed holistically, does not seek equitable relief and an adequate remedy exists at law, I grant Defendant's motion to dismiss for lack of subject matter jurisdiction.

## I. BACKGROUND

For purposes of Defendant's Motion to Dismiss Plaintiff's Verified Complaint (the "Motion to Dismiss"), I draw all facts from Plaintiff's Verified Complaint (the "Complaint") and the documents incorporated by reference therein.[1]

The Complaint focuses on Defendant's purported breaches of an Earnout Agreement the parties entered into on October 31, 2016, the same day they entered into a Stock Purchase Agreement (the "SPA"). Both agreements are between, on one side, Quarum and four other stockholders (together, the "Sellers"), and on the other, Defendant Mitchell International, Inc. ("Mitchell" or the "Buyer"). The SPA transferred all stock in QMedtrix Systems, Inc. ("QMedtrix") from the Sellers to Mitchell.[2]

QMedtrix developed systems and processes to streamline insurance companies' review and approval of claims for medical payments related to automobile insurance

---

[1] On a motion to dismiss, "the Complaint's allegations are assumed to be true, and the plaintiff receives the benefit of all reasonable inferences. For purposes of evaluating whether a defendant is subject to the court's jurisdiction, 'the court may go beyond the pleadings and look to affidavits and other discovery of record.'" *Virtus Capital L.P. v. Eastman Chem. Co.*, 2015 WL 580553, at *1 (Del. Ch. Feb. 11, 2015) (quoting *Chandler v. Ciccoricco*, 2003 WL 21040185, at *8 (Del. Ch. May 5, 2003)).

[2] Compl. ¶¶ 3-4, 11.

and workers' compensation claims.[3]  Mitchell provides claims review services to insurance companies and is one of the leading businesses in this field.[4]  As a leading provider of claims review services, Mitchell was well positioned to market and promote QMedtrix's systems and processes to Mitchell's existing customer base of insurance companies as part of Mitchell's "Solutions" services.[5]  Quarum was the individual most familiar with QMedtrix's systems and processes, and Mitchell hired Quarum as a full-time employee as part of the stock purchase.[6]

Under the terms of the SPA, Mitchell paid the Sellers a cash amount as partial consideration for the sale of their stock in QMedtrix.[7]  The Earnout Agreement provides Sellers with additional compensation during the first two years after closing of the SPA, calculated upon the amount of revenue Mitchell earns from the Solutions

---

[3]     *Id.* ¶ 9.

[4]     *Id.*

[5]     *Id.* ¶ 10.  QMedtrix's systems and processes, together with BillChek Solution and FairPay Solution, comprise "Solutions," as defined in the Earnout Agreement.  Def.'s Opening Br. Ex. B, at 2.

[6]     Compl. ¶ 12.

[7]     *Id.* ¶ 14.

(the "Earnout Amount").[8]  To maximize the Earnout Amount, Section 6 of the Earnout Agreement obligates Mitchell to act in good faith and use commercially reasonable efforts to present and promote Solutions to its customers.[9]  Mitchell agreed, among other things, to market Solutions to a minimum number of its customers during the first year after closing[10] and to build a network bridge between Mitchell's existing system and the DecisionPoint system, allowing Mitchell to integrate new customers into the systems.[11]  Under the terms of the Earnout Agreement, if Mitchell fails to fulfill these requirements, then Mitchell must indemnify the Sellers for any losses the Sellers sustain as a result of Mitchell's failure to perform.[12]

Although Mitchell hired Quarum initially to "provide product, marketing, sales, and operations advice to Mitchell relating to Solutions,"[13] Mitchell excluded Quarum

---

[8]     *Id.*

[9]     *Id.* ¶ 16; Def.'s Opening Br. Ex. B § 6(b).

[10]    Def.'s Opening Br. Ex. B § 6(b).

[11]    *Id.* § 6(c).

[12]    Compl. ¶ 28; Def.'s Opening Br. Ex. A § 6.03.

[13]    Compl. ¶ 13.

from its marketing and sales efforts.[14]  Suspecting that Mitchell was actually thwarting the promotion of Solutions, Quarum requested information regarding Mitchell's efforts.[15]  Quarum began to believe that Mitchell had not promoted Solutions to the minimum number of customers required by the Earnout Agreement.[16]  Quarum also learned that Mitchell did not build the network bridge as agreed in the Earnout Agreement.[17]  Instead, Mitchell built an alternative network bridge that it could implement more quickly.[18]  On January 8, 2018, over a year after the closing of the SPA, Mitchell terminated Quarum's employment.[19]

On January 19, 2018, Quarum filed this Complaint against Mitchell on behalf of the Sellers as Sellers' Representative.  In the Complaint, Quarum alleges that Mitchell breached the Earnout Agreement.[20]  Quarum seeks from this Court (1) a mandatory

---

[14]     *Id.* ¶ 18.

[15]     *Id.* ¶¶ 18.B, 20, 21.

[16]     *See id.* ¶ 20.

[17]     *Id.* ¶ 27.

[18]     *Id.*

[19]     *Id.* ¶ 22.

[20]     *Id.* ¶¶ 32, 40.

permanent injunction commanding Mitchell to perform its obligations under the SPA

and the Earnout Agreement and (2) damages resulting from Mitchell's breaches.[21]

Mitchell filed its Motion to Dismiss on March 21, 2018. After the parties

submitted their briefs, this Court heard the parties' oral arguments on October 11, 2018.

## II.    ANALYSIS

Mitchell moves to dismiss both counts of Quarum's Complaint for lack of

subject matter jurisdiction.

### A.    Count One for Injunctive Relief

Quarum seeks a mandatory permanent injunction in Count One of his Complaint.

Quarum claims 10 *Del. C.* § 341 provides this Court with jurisdiction over his claims

because he seeks equitable relief.[22]  Mitchell argues that Quarum fails to plead a claim

for which equitable relief is available because Quarum has an adequate remedy at law.[23]

---

[21]    *Id.* ¶¶ 38, 41.

[22]    *Id.* ¶ 8.  The Complaint also refers to 8 *Del. C.* § 111 as a source for this Court's jurisdiction, but Quarum abandons this theory in his Answering Brief.  Pl.'s Answering Br. 13-14.

[23]    Def.'s Opening Br. 14-16.

The Court of Chancery will grant a Rule 12(b)(1) motion to dismiss "if it appears from the record that the Court does not have jurisdiction over the claim."[24] "The plaintiff has the burden to establish this Court's jurisdiction over a particular subject matter."[25] The Court of Chancery is a court of limited jurisdiction. Section 342 of Title 10 of the Delaware Code states, "The Court of Chancery shall not have jurisdiction to determine any matter wherein sufficient remedy may be had by common law, or statute, before any other court or jurisdiction of this State." This Court acquires subject matter jurisdiction over a case "in only three ways: (1) the invocation of an equitable right; (2) the request for an equitable remedy when there is no adequate remedy at law; or (3) a statutory delegation of subject matter jurisdiction."[26]

"When a party challenges this Court's subject matter jurisdiction over a particular case, the '[C]ourt must review the allegations of the complaint as a whole to determine the true nature of the claim.'"[27] As former Chancellor Allen observed,

---

[24]     *Medek v. Medek*, 2008 WL 4261017, at *3 (Del. Ch. Sept. 10, 2008).

[25]     *Scattered Corp. v. Chi. Stock Exch., Inc.*, 671 A.2d 874, 877 (Del. Ch. 1994).

[26]     *Hillsboro Energy, LLC v. Secure Energy, Inc.*, 2008 WL 4561227, at *1 (Del. Ch. Oct. 3, 2008) (quoting *Medek*, 2008 WL 4261017, at *3).

[27]     *Id.* (alteration in original) (quoting *Christiana Town Ctr., LLC v. New Castle Cty.*, 2003 WL 21314499, at *3 (Del. Ch. June 6, 2003), *aff'd*, 841 A.2d 307 (Del. 2004)).

> Chancery jurisdiction is not conferred by the incantation of magic words. Neither the artful use nor the wholesale invocation of familiar chancery terms in a complaint will excuse the [C]ourt . . . from a realistic assessment of the nature of the wrong alleged and the remedy available in order to determine whether a legal remedy is available and fully adequate. If a realistic evaluation leads to the conclusion that an adequate legal remedy is available this [C]ourt, in conformity with the command of section 342 of title 10 of the Delaware Code will not accept jurisdiction over the matter.[28]

"[E]quity will take a practical view of the complaint, and will not permit a suit to be brought in Chancery where a complete legal remedy otherwise exists but where the plaintiff has prayed for some type of traditional equitable relief as a kind of formulaic 'open sesame'" to equity jurisdiction.[29]

### 1.    Contractually Stipulated Irreparable Damage

Section 7.11 of the SPA states that the "parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof . . . and that the parties shall be entitled to . . . injunctive relief to

---

[28]     *McMahon v. New Castle Assocs.*, 532 A.2d 601, 603 (Del. Ch. 1987) (citing *Hughes Tool Co. v. Fawcett Publ'ns, Inc.*, 297 A.2d 428, 431 (Del. Ch. 1972), *rev'd on other grounds*, 315 A.2d 577 (Del. 1974); *Chateau Apartments Co. v. City of Wilm.*, 391 A.2d 205 (Del. 1978)).

[29]     *Int'l Bus. Machs. Corp. v. Comdisco, Inc.*, 602 A.2d 74, 78 (Del. Ch. 1991).

prevent breaches of this Agreement."[30]  Quarum argues that this provision applies equally to both the SPA and the Earnout Agreement.[31]  Mitchell argues that because the provision references "breaches of this Agreement," the stipulation of irreparable damage applies only to breaches of the SPA, not to breaches of the Earnout Agreement.[32]

I need not resolve this dispute because even if the parties agreed that the irreparable damage stipulation of Section 7.11 applies to the Earnout Agreement, the parties do not have the authority to confer subject matter jurisdiction upon this Court through such an agreement.[33]

> Although a contractual stipulation as to the irreparable nature of the harm that would result from a breach cannot limit this Court's discretion to decline to order injunctive relief, such a stipulation does allow the Court to make a finding of irreparable harm provided the agreement containing the stipulation is otherwise enforceable.  *If the facts plainly do not warrant a finding of irreparable harm, this Court is not*

---

[30]     Def.'s Opening Br. Ex. A § 7.11.

[31]     Pl.'s Answering Br. 4-5.

[32]     Def.'s Opening Br. 12-13.

[33]     *See Butler v. Grant*, 714 A.2d 747, 749-50 (Del. 1998) ("It is . . . well-established Delaware law that parties cannot confer subject matter jurisdiction upon a court."); *El Paso Nat. Gas Co. v. TransAm. Nat. Gas Corp.*, 669 A.2d 36, 39 (Del. 1995).

> *required to ignore those facts, especially since the "parties*
> *cannot confer subject matter jurisdiction upon a court."[34]*

The plaintiff "has the burden of establishing a prima facie case for the equitable nature of its claims."[35] Without some pleaded allegation in the Complaint warranting a finding of irreparable harm, this Court does not have jurisdiction over this matter.

### 2. Adequate Remedy at Law

Mitchell argues that because the purpose of the Earnout Agreement is to provide payments to Quarum, he has an adequate remedy at law in the form of money damages.[36] Mitchell also argues that Quarum's claim for injunctive relief is a disguised claim of anticipatory breach of the Earnout Agreement.[37]

---

[34] *Kan. City S. v. Grupo TMM, S.A.*, 2003 WL 22659332, at \*5 (Del. Ch. Nov. 4, 2003) (emphasis added) (footnote omitted) (quoting *Butler*, 714 A.2d at 749-50) (citing *Signal Cap. Corp. v. Signal One, LLC*, C.A. No. 18011, at 88-89 (Del. Ch. May 15, 2000) (Jacobs, V.C.) (TRANSCRIPT)).

[35] *S'holder Representative Servs. LLC v. ExlService Hldgs., Inc.*, 2013 WL 4535651, at \*5 (Del. Ch. Aug. 27, 2013) (citing *Christiana Town Ctr.*, 2003 WL 21314499, at \*3).

[36] Def.'s Opening Br. 14-15.

[37] *Id.* at 15-16.

Quarum alleges that "Mitchell has not performed the specific covenants set forth in Section 6 of the Earnout Agreement."[38]  Mitchell agreed to the following covenants in Section 6 of the Earnout Agreement:

> (a) The Sellers acknowledge and agree that Buyer, as the ultimate owner of the Company from Closing, has the power to direct the management, strategy and decisions of the Company.  Notwithstanding the foregoing, Buyer agrees it will, and it will cause the Company and its affiliates to, act in good faith and in a commercially reasonable manner to avoid taking actions that would reasonably be expected to materially reduce the [Earnout Amount] . . . .
>
> (b) Buyer will act in good faith and use commercially reasonable efforts to present and promote the Solutions to customers that could reasonably be expected to utilize the Solutions.  Such efforts will include making introductions to a minimum of (i) 15 of the Buyer's customers listed on Appendix C within six (6) months following the Closing Date, (ii) 20 of Buyer's customers listed on Appendix C within one (1) year following the Closing Date, and (iii) 7 of Buyer's auto customers listed on Appendix D within one (1) year . . . .
>
> (c) Buyer will (i) use commercially reasonable efforts to implement any new customers enabled through Buyer's bill review systems relating to the Solutions within a commercially reasonable time frame, (ii) within six (6) months

---

[38]     Compl. ¶ 20.

> after the Closing Date, (A) upgrade the existing bridge be-
> tween Buyer's SmartAdvisor system and build a new bridge
> to the DecisionPoint system . . . .[39]

Quarum contends that despite its obligation to "use commercially reasonable efforts to present and promote the Solutions to customers," Mitchell failed to properly promote the Solutions to its customers.[40] Mitchell, Quarum alleges, also did not present the Solutions to the requisite number of customers.[41] Quarum further alleges that Mitchell failed to upgrade its SmartAdvisor system and has not built a new bridge to the DecisionPoint system as required by Section 6(c) of the Earnout Agreement.[42] Quarum seeks to compel Mitchell to perform the covenants set forth in Section 6 of the Earnout Agreement.[43]

In its response to these allegations, Mitchell points to a provision of the Earnout Agreement that extends the "Year 2" period on which a portion of the Earnout Amount

---

[39]     Def.'s Opening Br. Ex. B § 6; *see* Compl. ¶ 31.

[40]     Compl. ¶ 18.B.

[41]     *Id.* ¶¶ 20-21.

[42]     *Id.* ¶ 27.

[43]     *Id.* ¶ 38.

is calculated.[44]  Year 2 is extended if Mitchell fails to perform the covenants in Section

6(b) or 6(c)(i) of the Earnout Agreement, and that extension continues until Mitchell

performs the relevant covenants.[45]  Mitchell claims that this provision of the Earnout

Agreement provides an extension of time in the event Mitchell fails to meet its

obligations under Section 6.[46]  Mitchell, therefore, has not breached the Earnout

Agreement, and Quarum's claim for injunctive relief, Mitchell contends, is a disguised

claim of anticipatory breach of the Earnout Agreement.[47]

Certain of Quarum's allegations appear to form a claim of anticipatory breach

(*e.g.*, that Mitchell failed to market and promote the Solutions to Mitchell's

customers[48]).  This claim standing alone does not confer subject matter jurisdiction on

this Court.[49]  As to Quarum's remaining allegations, even if a portion of them are not

---

[44]    Def.'s Opening Br. 6-7, 21; Def.'s Reply Br. 11.

[45]    Def.'s Opening Br. Ex. B, at 3.

[46]    Def.'s Opening Br. 6-7, 21.

[47]    *See id.* at 21.

[48]    Compl. ¶ 40.

[49]    *See ExlService Holdings, Inc.*, 2013 WL 4535651, at *4 ("[Plaintiff] asserts equitable jurisdiction by seeking to enjoin [defendant] from breaching the contract once [plaintiff] has prevailed on the legal claim as to that contract's meaning.  But if that were the 'open sesame' to Chancery, this Court would cease to be a court of limited jurisdiction.  A plaintiff could always assert that a breaching party will breach again,

anticipatory, Quarum fails to allege a connection between Mitchell's purported breaches and any irreparable harm related to these breaches. The only allegation concerning irreparable harm beyond the stipulated harm in the SPA provision is that Quarum "has suffered and will continue to suffer irreparable harm from Mitchell's past and continuing failures to perform its obligations under the SPA and the Earnout Agreement."[50] Because Quarum fails to identify any form of irreparable harm, such as loss of control of reputation, loss of trade, or loss of good will,[51] "it appears from the record that the Court does not have jurisdiction over the claim."[52]

The purpose of the Earnout Agreement is to provide monetary consideration to the Sellers.[53] Mitchell's failure to perform its obligations under the Earnout Agreement

---

or that equitable relief will be necessary to enforce a judgment. Such contingencies are insufficient to represent an equitable claim, and the bare assertion of such contingencies is not a sufficient basis to state a claim of irreparable harm necessary to assert a right to injunctive relief."); *Candlewood Timber Gp., LLC v. Pan Am. Energy, LLC*, 859 A.2d 989, 997-98 (Del. 2004); *Faw, Casson & Co. v. Ballard*, 1984 WL 548381 (Del. Super. Dec. 17, 1984).

[50]    Compl. ¶ 34.

[51]    *See id.*

[52]    *Medek*, 2008 WL 4261017, at *3.

[53]    Def.'s Opening Br. Ex. B, at 1.

can be remedied with money damages.  Quarum, therefore, has an adequate remedy at law, and this Court lacks subject matter jurisdiction over this matter.[54]

### B.  Count Two for Breach of Contract

Quarum seeks money damages as relief for certain breaches of the Earnout Agreement.  Damages for breach of contract are available at law.  Thus, Quarum's claim for damages does not confer subject matter jurisdiction on this Court.

## III.  CONCLUSION

For these reasons, Mitchell's motion to dismiss for lack of subject matter jurisdiction is GRANTED.  This case will be dismissed if Quarum does not transfer the case to the Superior Court within sixty days pursuant to 10 *Del. C.* § 1902.

**IT IS SO ORDERED**.

Sincerely,

*/s/Tamika Montgomery-Reeves*

Vice Chancellor

TMR/jp

---

[54]  Because I find that Quarum has an adequate remedy at law, I do not address Mitchell's Rule 12(b)(6) arguments.